Silvia BARALDINI, et al., Plaintiffs,

v.

Edwin MEESE, Attorney General of
the United States of America, et
al., Defendants.

Civ. A. No. 88–0764.

United States District Court,
District of Columbia.

July 19, 1988.

Adjoa A. Aiyetoro, Alexa P. Freeman, Nat. Prison Project, ACLU Foundation, Washington, D.C., Jan Susler, Michael Deutsch, People's Law Office, Chicago, Ill., Elizabeth Fink, Brooklyn, N.Y., Mary K. O'Melveny, Lubell and Lubell, Margaret L. Ratner, Joan Gibbs, David Cole, New York City, for plaintiffs.

John D. Bates, John C. Cleary, Asst. U.S. Attys., Washington, D.C., for defendants; Harlan Penn, Atty. Advisor, Federal Bureau of Prisons, Washington, D.C., of counsel.

## SUPERSEDING MEMORANDUM OPINION *

BARRINGTON D. PARKER, Senior District Judge:

Plaintiffs Silvia Baraldini, Sylvia Brown, and Susan Rosenberg are prisoners in the Female High Security Unit ("Unit" or "HSU"). The Unit, designed for women who present serious security problems is located at the Lexington, Kentucky, Federal Correctional Institution ("FCI"). In a complaint that presents serious constitu-

---

\* The Memorandum Opinion of this date supersedes and corrects certain typographical and grammatical inaccuracies found in the Court's Memorandum Opinion of July 15, 1988.

tional questions, plaintiffs charge that the United States Attorney General, several officials of the Federal Bureau of Prisons ("Bureau" or "BOP") and certain officials of Federal Correctional Institutions [1] have violated their First, Eighth, and Fifth Amendment rights. They claim that because of defendants' involvement in various decisions to assign them to the Female High Security Unit, they have been subjected to unlawful deprivations which violate their fundamental constitutional rights. Their counsel seek injunctive relief, preliminary and permanent, as well as declaratory relief.

Immediately after the complaint was filed, the government moved to transfer the proceeding to the Eastern District of Kentucky. The motion was denied. Plaintiffs then requested and were granted expedited discovery. Schedules were approved calling for depositions of the defendants, several expert witnesses, and plaintiff Silvia Baraldini. An endless number of exhibits and documents was also generated.

Meanwhile, in opposing plaintiffs' motion for preliminary injunctive relief, the government countered with a motion to dismiss, or alternatively, for summary judgment. Thereafter, the preliminary injunction hearing and the government's motions were consolidated into a trial proceeding on the merits. Fed.R.Civ.P. 65(a)(2). Jurisdiction of this Court was invoked under 28 U.S.C. §§ 1331 and 1361.

The testimony of the witnesses, the depositions proffered by the parties in support of their claims and defenses, the numerous exhibits and documents admitted into evidence, the legal memoranda and the final arguments of counsel have been fully considered. For the reasons set forth below, the Court finds that while plaintiffs have clearly shown that they are entitled to relief on First Amendment grounds, their Eighth and Fifth Amendment claims are less persuasive and are denied.

**1.** The other defendants include: the Director, Assistant Director and two Regional Directors of the Bureau, the Wardens of three correctional institutions and the correctional officer in charge of the Female High Security Unit.

# I.

# FINDINGS

*The High Security Unit*

The High Security Unit was opened in October 1986. Twenty months later, by July 1, 1988, only seven women have been assigned to the Unit. Ms. Rosenberg was transferred in October, 1986; Ms. Baraldini and Ms. Brown were transferred between January and May, 1987. As of March 1, 1988, the plaintiffs and two other prisoners were the only women confined in the facility. Two additional prisoners have since been assigned—one in late March 1988, one in early June 1988. The Unit has always had a high vacancy rate even though it has a limited capacity of 16 women.

Prior to the opening of the Unit, the executive staff of the Bureau recognized that the security needs of their female population were slowly outpacing the security features of the then available institutions for women. (Px. 79 at 6–7, 12–13; Px. 83 at 14–15, 19.) [2] Indeed, before 1980, a relatively small number of high security female offenders was committed. The Bureau had not built a high security penitentiary for women, nor had it provided for high security complements at any existing women's facility. Because the only federal institutions for women were designated as minimum security, they were considered vulnerable to all types of escapes.

As the number of women prisoners considered capable of sophisticated and unusual means of escape increased, the Bureau staff began to seek an appropriate facility. In 1985, the U.S. Public Health Service vacated its occupancy of a portion of the Lexington, Kentucky FCI. The Bureau then remodeled the vacated space and built an accommodation for 16 women who posed potential security problems.

*The Bureau's Assignment Policy*

On September 2, 1986, G.L. Ingram, Assistant Director, Federal Bureau of Pris-

**2.** References to exhibits are cited respectively as "Px" (plaintiff) and "Dx" (defendant).

ons, addressed a memorandum to the several Regional Directors describing the type of inmate who should be considered for placement in the Unit.

> Candidates for placement in this unit are those females whose confinement raises a serious threat of external assault for the purpose of aiding the offender's escape. Other females who have serious histories of assaultive, escape-prone or disruptive activity may be considered on a space available basis.

> \* \* \* \* \* \*

> Inmates in the unit can be only one custody: maximum. Prior to transferring an inmate to the unit, staff at the originating institution are to increase the inmate's custody to maximum.

(Px. 50.) He further noted "[c]onsideration for transfer from the unit should be given when the original factors for placement in the unit no longer apply and when placement in a less secure facility becomes appropriate." *Id.*

The wardens of the several women's facilities sent candidate referrals to their respective regional offices. If the Regional Director concurred with the warden, the prisoner's official folder would be forwarded to the Southeast Regional Office which oversees the Lexington FCI. After the Regional Director reviewed the material, he referred the matter to the Bureau Director who made the final decision to transfer the prisoner.

Shortly after a prisoner's arrival at the Unit, she met with the "Unit Team," a committee which included the Unit Manager, Case Manager, Unit Counselor, Psychologist, and other correctional specialists. The committee was charged with the general responsibility of conducting a post-transfer review where the women were shown documentation from their official prison folder and they received some indication of the reasons why they were assigned to the Unit. The Unit Team also performed quarterly reviews of each prisoner's adjustment to the Unit and their assignment status. Unit Manager Robert Figlestahler gave deposition testimony about a typical review session:

> The unit manager chairs the team,.... the counselor provides a summary of the individual's work record. The case manager will discuss any major changes in one's case.... the psychologist will ... bring up any pertinent information which he feels the team should be aware of. At that point ... the inmate may also discuss whatever ... is appropriate [sic] to make a request of the team.... The team will then consider the request.... Those are briefly summarized ... and copy is given to the inmate and a copy is placed in the central file.

(Px. 81 at 134–35.) As detailed as this procedure appeared, it is misleading. The written report produced after each review session is a mere one-page form with the inmate's name, the date, a few checked boxes, and occasional cryptic comments such as: "Requests transfer—no change in criteria for placement." (Px. 43 (Rosenberg's Review of 9/8/87); *see also,* Px. 12; Px. 23.) Nor is there an indication, after a review of plaintiffs' quarterly reports, that any serious consideration was ever given to the matter.

For a prisoner to be transferred out of the High Security Unit, guidelines set out in an "Institutional Supplement" developed on December 3, 1986 provided that:

> When the unit team considers that the original factors which required placement of an inmate into the unit no longer apply and when placement in a less secure facility is deemed appropriate, they will forward a transfer packet to the Warden through the Associate Warden (Programs). If the Warden concurs, he will forward the packet to the Southeast Regional Director for review. The Southeast Regional Director after reviewing the case will forward the transfer packet to the Director, ... for final redesignation approval.

(Px. 59 at 7–8.) Interestingly enough, since its opening in October 1986, no prisoner has been transferred out of the Unit.

*The Plaintiffs*

*Silvia Baraldini*

Silvia Baraldini was transferred to the High Security Unit in January 1987. She

was convicted of racketeering, conspiracy, armed robbery, and criminal contempt in 1984 and sentenced to 43 years in prison. Initially she served two years at the New York City Federal Metropolitan Correctional Center, and was then transferred to the Pleasanton, California, FCI.

At both facilities, she was always housed among the general prison population and her incarceration presented no unusual problems to prison officials. It was without incident. However, when she was selected for transfer to the High Security Unit, and in accordance with recently promulgated guidelines, her status was automatically increased to maximum. Before then, she had a lower classification at both the New York City and Pleasanton units.

Prior to Baraldini's assignment to the Unit, her transfer papers from the Pleasanton FCI included the following reference:

Ms. Baraldini is a member of the May 19th Communist Party which is sympathetic to other radical groups including the New African Freedom Front and the FALN. She participated in the successful 1978 escape of Jo Anne Chesamire [sic] from the New Jersey State Women's Prison. Members of her group have participated in numerous armed robberies where police officers were wounded or killed.

(Px. 6.) Additional references noted that she was a member of the "Family"—"a revolutionary organization whose members advocate the overthrow of the U.S. government through violent means." (Px. 8.)

### Sylvia Brown

Sylvia Brown was transferred to the Unit on May 5, 1987—serving a sentence in excess of 20 years for interstate kidnapping, probation violations, and prison escapes. Following those sentences, she faces official detainers from Texas and Colorado state authorities. She was initially committed to the Alderson, West Virginia, FCI in December 1980. Since then she has had two disciplinary transfers: from Alderson to the Pleasanton, California, FCI and from there to the Metropolitan Correctional Center, San Diego, California. She was recommitted to Pleasanton, but escaped

more than a year later. After apprehension, she was designated to the Tucson, Arizona, FCI.

In January 1987, the authorities at Tucson recommended her transfer to the High Security Unit. The Bureau approved the transfer based on the details of her escape —that she received organized outside assistance, including payments of money, transportation arrangements, and sophisticated weapons. The warden at Tucson noted in a transfer request to the Western Regional Director that she was an appropriate candidate for placement in the Lexington High Security Unit. (Px. 22 at 2.)

### Susan Rosenberg

Susan Rosenberg was assigned to the Unit on October 29, 1986. In 1985, she was sentenced to 58 years for conspiracy to possess unregistered firearms, unlawful use of false identification documents, and possession of unregistered destructive devices. Her transfer request of August 9, 1986 stated:

Rosenberg has been associated with the FALN, Black Liberation Army, and other terrorist groups. She also was thought to have been involved in an 1981 Brinks Armed Car Robbery and has previously been linked to the Joanne Chesimard escape in 1979. She also has threatened in open court to take her armed revolution behind prison walls. For the above reasons, we are referring her to a maximum security institution.

(Px. 33.) Another memorandum relating to her placement in the Unit reported that she "represents a severe escape risk. In the past, the FALN has attempted to aid fellow members in their escape from confinement. We believe that this group will attempt to free [her]." (Px. 35.) Rosenberg and another prisoner from the Tucson FCI were the first assigned to the Unit.

## II.

### LEGAL ANALYSIS

In recent years, when prison inmates presented challenges to conditions of confinement, federal district courts have generally shied away from grappling with mat-

ters of prison administration and practices. That policy of restraint stems in large measure from higher court decisions which have narrowly limited the scope of review of such matters.[3] This has been based on the notion that courts are ill-equipped to intervene in daily problems of prison reform and day-to-day administrative matters, and that correctional institutions should not be operated by court decree.

This is an oversimplification and often a misstatement of both the problem and the solution. Such an approach fails to face realistically and squarely the ever-mounting problems associated with increasing prison populations and the lack of resources and facilities, financial and otherwise, to grapple effectively with pressing problems.

However, at the same time there is a strongly embedded view that even though a person may stand convicted and sentenced for serious crimes, she is still entitled to her constitutional rights. As Justice White noted 15 years ago, in addressing the question of prisoners' rights and speaking for the majority of the Court:

> Though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is in prison for crimes. There is no iron curtain drawn between the Constitution and the prisons of this country.... In sum, there must be mutual accommodations between institutional needs and objectives and the provisions of the Constitution that are of general application.

*Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1973). The Supreme Court has directed federal courts to "discharge their duty to protect constitutional rights" when a prison regulation or practice offends a fundamental constitutional guarantee. *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974).

## A. FIRST AMENDMENT CLAIMS

A major contention of plaintiffs' counsel is that the Bureau's guidelines governing the transfer of their clients to the Lexington High Security Unit violate First Amendment rights because they retaliate against plaintiffs for holding leftist political ideologies and associating with groups viewed by the government as "radical." Counsel contend that the criteria are overbroad and vague, and that their application has the effect of punishing the women for exercising their freedoms of speech, association, and expression. And finally, counsel maintain that the criteria serve no legitimate penological purpose but are exaggerated responses by federal correctional officers.

*Assignment Criteria Relied Upon*

Before the High Security Unit opened and prior to the issuance of any published criteria for assignment thereto, Norman Carlson, former Bureau director,[4] wrote Congressman Robert Kastenmeier[5] on June 16, 1986, that a secure unit for women was necessary because of concerns about "the threat of external terrorist attacks on institutions." (Px. 48.) On July 29, 1986, Director Carlson addressed a second letter to the Congressman reaffirming the same concerns and also noting that females with histories of "assaultive, escape prone or disruptive activity would also be considered on a space-available basis." (Px. 49.)

However, in September 1987, one year after the Unit was opened, Director Mi-

---

3. In *Inmates of Occoquan v. Barry,* 844 F.2d 828 (D.C.Cir.1988), *reh'g en banc denied* 850 F.2d 796 (1988), Circuit Judge Kenneth Starr recently wrote that "the administration of prisons implicates broader concerns over judicial competence to decree sweeping modifications in prison conditions." He reminded trial courts that the operation of correctional facilities is "peculiarly the province of the Legislative and Executive Branches, of our Government, not the Judicial." *Id.* at 835 (citations omitted).

4. Norman Carlson was succeeded by Michael Quinlan as Bureau Director on July 1, 1987. The three plaintiffs were transferred to the HSU during Director Carlson's tenure.

5. Representative Kastenmeier has served as Chairman of the Subcommittee on Courts, Civil Liberties, and the Administration of Justice for the past 20 years. The Subcommittee oversees legislation involving the Bureau of Prisons.

chael Quinlan wrote Congressman Kastenmeier and noted that other factors were also considered, namely:

> *A prisoner's past or present affiliation, association or membership* in an organization which has been documented as being involved in acts of violence, attempts to disrupt or overthrow the government of the United States ... *is a factor considered* by our staff in assessing the security needs of any inmate.

(Px. 55 at 2) (emphasis added). Later, in a letter to the Congressman written in early 1988, perhaps with some recognition of First Amendment problems, Director Quinlan admitted that the criteria for assigning female prisoners to the Unit "could have been more appropriately stated." (Px. 56 at 2.) He went on to explain:

> Categorically, prisoners are not assigned to this or any unit on the basis of their political beliefs or ideology. We recognize that assigning prisoners to any unit on this basis would be entirely inappropriate. This does not mean that we ignor [sic] the history and activities of groups to which the individuals belong, even though that affiliation may be for ideological reasons. Beliefs, whether political [sic] religious, or ideological, do not immunize activities which pose threats to the safety and well-being of others.

*Id.* According to Quinlan, the Bureau looked primarily at the severity and nature of a prisoner's offense, prior criminal record, escape history, and prior involvement with organizations involved in attempts to overthrow the United States government. *Id.* at 2–3.

Assistant Director G.L. Ingram gave recent deposition testimony that an inmate's contacts with such groups is relevant because certain groups have been known to provide outside assistance in prison escapes. If the Bureau becomes aware that outsiders could help an inmate escape, that factor enters into a determination of a prisoner's institutional assignment. (Px. 83 at 54–55.)

As the assignment criteria were disseminated among the Bureau's wardens and regional directors, the focus on an inmate's political ideologies became obvious. On September 11, 1986, Warden Rob Roberts of the FCI Pleasanton wrote to the Western Regional Director, Jerry Williford that:

> An in-depth review of the criteria established for placement in the High Security Unit and our inmate population has clearly revealed that the seven individuals named below should be seriously considered for placement in the Unit.

> \*   \*   \*   \*   \*   \*

> The offenses for which these individuals have been sentenced were the result of their *committed alliance to terrorist-oriented ideals and politically-revolutionary organizations.*

(Px. 99.) (emphasis added).

### The Criteria are Overbroad and Vague

Government regulations must be narrowly drawn to serve legitimate interests without unnecessarily interfering with First Amendment freedoms. Poorly designed regulations which encroach upon an individual's freedoms of speech, expression and association may be stuck down for being overbroad or vague.

#### Overbreadth

█  A law is void on its face if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise" of protected expressive or associational rights. *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). The Supreme Court has repeatedly struck down legislation on its face when it "create[s] an unacceptable risk of the suppression of ideas." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 797, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984).

█  The "overbreadth" doctrine supports challenges to a regulation that directly restricts a protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest. *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980). The Bureau's criteria for place-

ment in the HSU restricts female inmates' political associations and expressions. If the government is concerned about violent prison escapes orchestrated by outsiders, there are more appropriate methods to prevent such acts. By focusing on an inmate's prior associations, the Bureau encroaches on constitutionally protected freedoms.

■ The First Amendment embraces the right of an individual to speak one's mind. It also includes the right to advocate and join with others in an effort to make that advocacy effective. *NAACP v. Button*, 371 U.S. 415, 430–31, 83 S.Ct. 328, 336–37, 9 L.Ed.2d 405 (1963). Whatever action one can lawfully pursue as an individual, one is free to pursue with others. *See Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). If Silvia Baraldini believes the United States Government is unjust, she has the right to say so. If she joins a group of people who share her view, they may speak out and together declare their position. If she believes that communism is more equitable and desirable than capitalism,[6] she may freely hold this view. If Susan Rosenberg believes Puerto Rico should be an independent country,[7] she is entitled to adhere to this position. The United States was founded by people whose beliefs were considered subversive and who offered what many regarded as "unacceptable" views.

■ The government can abridge an individual's First Amendment freedom of association only if it can show that the association is engaged in unlawful pursuits. An association or organization cannot be made illegal in the absence of a clear showing that the group is *actively* engaged in lawless conduct. *Noto v. United States*, 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1521, 6 L.Ed.2d 836 (1961) ("[T]he mere abstract teaching of Communist theory, including the teaching of . . . the moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."). An individual cannot be punished for joining, associating with, or attending meetings of an association or organization, unless the association is clearly shown to be illegal and the individual affiliated with the group has (1) knowledge of its illegality, and (2) the specific intent to further its illegal aims by such affiliation. *See Elfbrandt v. Russell*, 384 U.S. 11, 15–17, 86 S.Ct. 1238, 1240–1241, 16 L.Ed.2d 321 (1966) (Political groups may embrace both legal and illegal aims, and one may join such groups without embracing the latter.); *Aptheker v. Secretary of State*, 378 U.S. 500, 511, n. 9, 84 S.Ct. 1659, 1666, n. 9, 12 L.Ed.2d 992 (1964) (Defendant must have knowledge of the organization's illegal advocacy.) Our Supreme Court has repeatedly held that mere membership in organizations such as the Communist Party or the Students for a Democratic Society does not justify infringing upon an individual's rights. *United States v. Robel*, 389 U.S. 258, 262, 88 S.Ct. 419, 423, 19 L.Ed.2d 508 (1967) ("It is precisely because [the] statute sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership, that it runs afoul of the First Amendment.").

It is no crime for Baraldini and Rosenberg to be members of leftist political organizations, even if those groups have engaged in unlawful pursuits in the past. Since it cannot be inferred automatically from their former memberships that they unqualifiedly subscribe to every aspect of the groups' conduct, their placement in the High Security Unit cannot be justified without more credible documentation than that found in the Bureau's records.

Relying on *Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the

---

**6.** Plaintiff Baraldini testified that in the late 1970's she became a member of the May 19th Communist Organization. That group, however, no longer exists. (Px. 18 at 15–16.)

**7.** According to Rosenberg's transfer papers, she is a member of the FALN. (Px. 33, 34, and 35.) The FALN is a politically-active group seeking independence for Puerto Rico from the United States.

government argues that plaintiffs' facial challenge is inappropriate. In *Munson*, the Supreme Court held that if a statute prohibited "identifiable and constitutionally proscribable conduct," the litigant's "facial" challenge would fail, and he or she would be required to make an "as applied" challenge. *Id.* at 965–66, 104 S.Ct. at 2851–52. But the Bureau's primary criterion for assignment to the Unit is whether the female inmate is associated with groups which the government identifies as "terrorist." The main guideline regulates no easily identifiable and constitutionally proscribable conduct. Instead, the Bureau is free to pick out women who may at one time have been associated with an organization which supports the disruption of the United States government. Such an infringement on plaintiffs' constitutional rights is not justified by administrative concerns nor by the existence of an associational link to a group with a history of illegal or disruptive behavior. *See Healy v. James*, 408 U.S. 169, 185–86, 92 S.Ct. 2338, 2348–49, 33 L.Ed.2d 266 (1972) (college students seeking to form a chapter of Students for a Democratic Society cannot be denied recognition solely because the national organization has a philosophy and history of disruption and violence). Because the sweep of the High Security Unit criteria includes impermissible applications, it is unconstitutionally overbroad. *See Munson, supra,* 467 U.S. at 966, 104 S.Ct. at 2852. The overbreadth of the HSU criteria is not only real, it is substantial as well, judged in relation to its purpose. The Bureau must achieve its goals of greater prisoner security by means which are less restrictive than the present methods which have an impermissible impact on First Amendment freedoms.

### Vagueness

The vagueness problem occurs when the government states its proscriptions in terms so indefinite that the border between innocent and condemned conduct becomes a matter of guesswork. A law that is too general, risks ensnarement of the innocent in a net designed for others. The First Amendment demands that regulations must be specifically drawn; precision of regulation is the touchstone.

■ A law is void on its face if it is so vague that. persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Although the vagueness doctrine focuses both on actual notice to citizens and arbitrary enforcement, the Supreme Court has recognized that the more important aspect of the doctrine is the establishment of minimal guidelines for law enforcement officials. Justice O'Connor wrote: "Our concern here is based upon the 'potential for arbitrarily suppressing First Amendment liberties....'" *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983).

Government counsel incorrectly argues that the vagueness doctrine only applies to criminal statutes or ordinances in its reply brief. (June 23, 1988). But the Supreme Court has often applied a vagueness test in its analysis of civil cases. *See, Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (local ordinance requiring license for selling of drug paraphernalia); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed. 2d 152 (1982) (local ordinance directing law enforcement officials to consider whether applicants to operate coin-operated amusement establishments have "connections with criminal elements"); *see also, Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

■ The High Security Unit assignment criteria are so vague that the line is blurred between those inmates chosen for the Unit and those who remain in the general prison population. These criteria assume that any prisoner with an undefined relationship to an unspecified political group having an ideology adverse to the United States government and undertaking actions based on that ideology is a candidate for assignment to the HSU.

This problem was acknowledged in September 1987, when Sam Calbone, an associ-

ate warden at the Lexington FCI, addressed an internal memorandum to the Chief Warden of the facility, L.E. DuBois, in which he candidly admitted that:

> [W]e have not adequately identified or defined the criteria for placing high security females on the unit, nor have we outlined a proper administrative review procedure.... Lastly, and perhaps most importantly, we find that there is a general weakness with respect to the criteria utilized for releasing inmates from the unit.

(Px. 54 at 1.) Interestingly enough, there is nothing in the record showing that the criteria have been amended or modified in any manner, nor has government counsel pointed to any document or exhibit which shows that the problem has been addressed.

### "As Applied" Analysis

A prisoner may not be transferred to another facility in retribution for exercising her constitutional rights. While a prisoner may not have a due process interest or expectation in remaining at the same institution, she does have a First Amendment interest or expectation in not being punished for exercising her freedoms of speech, association, and expression. *Buise v. Hudkins*, 584 F.2d 223, 230 (7th Cir.1978), *cert. denied* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

Baraldini and Rosenberg are allegedly members of several political organizations. Bureau officials involved in assigning them repeatedly refer to their affiliations with certain "radical" groups.

Two district court rulings present facts analogous to those here and are in many respects instructive: *Brown v. Neagle*, 486 F.Supp. 364 (W.Va.1979) and *Boudin v. Thomas*, 533 F.Supp. 786 (S.D.N.Y.1982), *appeal dismissed*, 697 F.2d 288 (2nd Cir. 1982). In *Brown*, a woman inmate who had become friends with Assata Shakur (Joanne Chesimard) and who had also been a member of a leftist organization, was placed in administrative detention after Shakur's escape. Plaintiff Brown was placed in administrative detention because the warden at the Alderson FCI believed she might be an "escape risk." Finding that the increased security was based not on plaintiff's conduct, but on her previous relationship to Ms. Shakur's and Brown's political affiliations, the trial court stated: "[I]t should be apparent that a mere subjective belief that the petitioner might attempt to escape is not enough to warrant her being placed in what amounts to solitary confinement." *Id.* at 366. Holding that "due process and essential fairness demand ... credible evidence" to base a belief that plaintiff posed an escape risk, the court ordered the prison officials to justify their actions, reconsider Ms. Brown's status each week, issue a written rationale for continued detention, and make numerous changes in her confinement. *Id.* at 367–68.

In *Boudin*, a pretrial detainee was placed in administrative detention because of her alleged crimes and association with notorious political groups. The district court held that Ms. Boudin was being "subjected to the effects of isolation based upon conclusory evidence linking [her] to the Joanne Chesimard (Assata Shakur) escape and terrorist organizations." 533 F.Supp. at 790. While claiming not to question the judgment that plaintiff might present escape risks, the court held that the response to the risk was exaggerated and amounted to punishment in violation of constitutional rights.

During their years in custody, Baraldini and Rosenberg have never threatened the staff, other inmates, or the security of any correctional institution. The Bureau has failed to identify clearly what it is that causes a belief that plaintiffs pose a risk of escape through external assault or that they are currently connected to political organizations engaged in illegal pursuits.

The Bureau claims that it selects women for the Unit who appear capable of escaping with outside help. Yet, while numerous women have escaped from the federal correctional system, many with outside assistance, the Lexington Unit has had at least a 56 percent vacancy rate since October 1986. Warden Roberts of the Pleasan-

ton, FCI and Western Regional Director Williford testified during their depositions that at least a dozen female prisoners were referred from Pleasanton, several with prior escape records, but only plaintiff, Silvia Baraldini, was approved. (Px. 88 at 105, 123–25, 127; Px. 89 at 14.) Because of her political statements and associations, Susan Rosenberg was slated for the Unit long before it opened. These facts which include information from correctional officials immediately involved, support a finding that Baraldini and Rosenberg were singled out and placed in the High Security Unit for their alleged past connections with leftist groups promoting ideas that some government officials did not favor.

Bureau Assistant Director Ingram testified at his deposition that if the plaintiffs had "no connection with this [political] group," it would be a factor in deciding whether they were transferred out of the HSU. (Px. 83 at 55–56.) Director Quinlan also stated that a prisoner's ongoing status as a member of a political organization would be based on her prior activity. (Px. 87 at 91.) When questioned about reviewing plaintiff Baraldini's assignment, the Unit Manager testified that he believed there was a continuing need for her confinement because the factors for the original designation had not changed. In his eyes, Ms. Baraldini had a continuing relationship with political groups. However, he had "received no new information" that her contacts or affiliations had ceased. (Px. 81 at 154.)

There is a secondary criterion for assignment: If space is available, the Bureau will "consider" placing women in the Unit who have "serious histories of assaultive, escape-prone or disruptive activity." (Px. 50.) The alternative, "space-available" criterion of choosing women with escape histories may fall within the range of easily identifiable and constitutionally proscribable conduct. But it is clear that the Bureau has not followed this guideline. Since its opening the Unit has had plenty of space available for women with escape histories, yet only two women who fell in the category, were transferred. The last of the two was transferred only last month.

Defendants argue that under 18 U.S.C. § 4082(b), the Attorney General has unfettered discretion to transfer a prisoner from any facility for any reason. However, they fail to mention that prison officials may not confine an inmate in a particular institution if the reason for the assignment is itself constitutionally impermissible. *Olim v. Wakinekona,* 461 U.S. 238, 248 n. 9, 103 S.Ct. 1741, 1747, n. 9, 75 L.Ed.2d 813 (1983) (empowering the state to confine the inmate in any penal institution unless "the reason for confining the inmate in a particular institution is itself constitutionally impermissible"). The Bureau does not have the discretion to punish an inmate because she has exercised her rights of free speech, expression and association, by transferring her to a different institution. *See Garland v. Polley,* 594 F.2d 1220, 1222–23 (8th Cir. 1979). Courts must be wary that deference to prison administrators should not be a "blind allegiance inconsistent with the notion that 'a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims.'" *Buise, supra* 584 F.2d at 230. Case law places an affirmative duty upon courts to insure that administrative actions do not violate the fundamental rights of prisoners. *United States v. Lilly,* 576 F.2d 1240 (5th Cir.1978).

*No Legitimate Penological Purpose*

Prison regulations that impinge on inmates' constitutional rights are valid if they are reasonably related to legitimate penological interests. *Turner v. Safley,* — U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Defendants have identified security concerns as the penological goal of their assignment criteria. While deference is normally given to prison officials, particularly in security matters, such deference is not warranted when a penological regulation is an exaggerated response to security objectives. *Safley,* 107 S.Ct. at 2266. Substantial evi-

dence indicates that the officials have exaggerated their response to institutional security considerations. In such a case, courts should not abdicate their responsibility to protect fundamental liberties.

*Safley,* provides several factors for determining the reasonableness of a regulation:

1) Whether there is a "valid, rational connection" between the prison regulation and the legitimate, neutral governmental interest.

2) If alternative means of exercising the constitutional right remain open to prison inmates.

3) The impact an accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources.

4) The absence of ready alternatives.

107 S.Ct. at 2262. The regulations involved here suffer under the application of the first *Safley* factor because the governmental objective is not neutral. Every document used to support the transfers of plaintiffs Baraldini and Rosenberg concentrates on their political views and associations. In focusing on the political organizations that they may have been affiliated with in the past, the Bureau is clearly concerned with the ideologies of those groups. Because the assignment criteria specifically scrutinize the content of Baraldini and Rosenberg's expressions, the regulations abridge First Amendment freedoms retained by prison inmates. *Bell v. Wolfish,* 441 U.S. at 551, 99 S.Ct. at 1880.

Baraldini and Rosenberg testified that they were told they must disavow any association with leftist political groups in order to be released from the High Security Unit. (Px. 18 at 63; Px. 46 at 76–77.) Assistant Director Ingram and Unit Manager Figlestahler testified that if they received reliable outside information that plaintiffs were no longer affiliated with such organizations, they would consider relocating them. (Px. 83 at 55–56; Px. 81 at 154.) Since it appears that Baraldini and Rosenberg will only be able to return to the general prison population if they renounce their political beliefs, it is obvious that no alternative

means of exercising their First Amendment rights exist. Because these views lead to their placement in the Unit, plaintiffs are discouraged from making their positions known. As a result, the Bureau is closing available avenues for the exercise of their freedoms of speech, expression, and association.

Defendants have not shown that accommodating Baraldini and Rosenberg's First Amendment rights would in any manner adversely impact on the operations of the prison systems. Neither formulating new criteria for transfer nor providing meaningful quarterly reviews would place an undue burden on the Bureau. Baraldini and Rosenberg could be relocated in the general prison population with little trouble. The two had previously been incarcerated in the general population for several years without incident. Their disciplinary records were of no consequence, indeed, the records were not mentioned in their referral papers to the Unit. There is no evidence that they require increased security and if they are reassigned to the general prison population, there is nothing to suggest that the institutional system would be strained.

Under the fourth *Safley* factor, if there are ready alternatives to a challenged regulation, the regulation may be an "exaggerated response" to prison concerns. *Safley,* 107 S.Ct. at 2262. The extreme measures taken by the Bureau to isolate the two women, who may have been affiliated with liberal political groups which may have been involved in aiding one person escape from prison are exaggerated responses. While the Bureau's criterion of transferring women with escape histories to the Unit is an acceptable response, the designation of prisoners solely for their "subversive" statements and thoughts is the type of overreaction that the Supreme Court has repeatedly warned against.

Plaintiffs have pointed to ready alternatives that fully accommodate their rights at *de minimis* cost. The Bureau would have spent much less money housing the plaintiffs if they were placed in existing secure federal institutions. The High Security

Unit was extremely expensive: more than $735,000 to remodel a facility that has housed a handful of women for nearly two years. This facility will be shut down as soon as the Bureau's new larger, high security female institution is completed in Marianna, Florida.[8] The operational costs are steep "due to the increased staffing ration." (Px. 53 at 3.) Given the limited use of the High Security Unit, the extreme daily security measures, and the absence of clear and certain support for Baraldini and Rosenberg's high custody level, it appears to this Court that placement of Baraldini and Rosenberg in the Unit is an exaggerated response, and violates their First Amendment rights.

Finally, this is not an instance where the "ripple effect" on the security of fellow inmates and prison staff justifies a broad restriction on inmates' rights. Defendants have not shown that allowing Baraldini and Rosenberg to exercise their First Amendment rights will lead to external assault, violence, or increased prison escapes. Defendants may be concerned that the two plaintiffs will persuade inmates within the general prison population to share their political views but those fears cannot be accommodated at the expense of the constitutional rights of others.

## B. EIGHTH AMENDMENT CLAIMS

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." It limits the power of officials "entrusted with the criminal-law function of government" and is "designed to protect those who were convicted of crimes." *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977). Plaintiffs allege that defendants have exceeded their authority and violated those constitutional guarantees in the daily administration and operation of the High Security Unit.

*Conditions Within the Unit—Prisoner's Treatment*

Plaintiffs Baraldini, Brown and Rosenberg charge that the physical conditions of the Unit and their personal treatment by correctional officers are far below acceptable norms for a federal prison. They complain that their cells, partially located below ground level in a basement, afford little natural light; that their cells faced the inner side of the basement where there is limited exposure to daylight; that the temperature is cold in the winter; that hot water for showers is often unavailable; and that shower curtains were lacking for nearly one year. Plaintiffs assert that they are given ill-fitting clothing, allowed no personal belongings—only a few books, limited in their telephone calls to two per week, and their approved list of visitors has been drastically restricted.

Testimony was presented as to the extreme security measures used, namely: that plaintiffs are shackled, handcuffed, and accompanied by four prison guards on their scheduled visits to the prison doctor and dentist; that even though accompanied by four guards on such visits, they are nonetheless exposed to strip searches upon return to the Unit; that on many occasions the guards performed improper "personal" patdown searches upon returning from their outdoor exercise.

They variously testified that the staff harasses them by disparagingly commenting on their personal appearance, political beliefs, and chances of release; that the guards deliberately engaged in loud and disturbing noises at night which interrupted their sleep; that they deliberately engage in voyeurism—watching them undress before showering, deliberately walk unannounced into their cells while they are attending to their personal hygiene, and frequently ignore simple requests. In addition to these verbal complaints, plaintiffs have also lodged various written com-

---

**8.** According to Assistant Director Ingram, a larger unit for women inmates requiring high security is under construction at the existing minimum security federal facility in Marianna, Flor-

ida. According to Director Quinlan, the unit was scheduled to open in mid-July 1988. (Px. 87 at 95.)

plaints with the Unit staff. (See Px. 14, 15 and 40.)

Defendants' response to many of plaintiffs' charges is not a denial or that they are groundless, but rather that the Bureau has attempted to and has indeed rectified a large number of the complaints before this lawsuit was filed. That, however, is a sorry response to the complaint and is a shameful reflection on the Bureau's administration. Only after repeated complaints by plaintiffs and their counsel, were minimal efforts expended to install shower curtains, to extend the list of visitors, to outlaw strip searches following outdoor exercise, and to relocate plaintiffs on the side of the building which afforded more daylight exposure and to repair broken exercise equipment. Even though those concessions had been made, the Bureau still operates a unit that in many respects, measures below acceptable standards for federal prisons.

*Effect Upon the Plaintiffs*

Plaintiffs claim that such conditions have left them with extreme emotional distress, a feeling of isolation, tenseness, and depression. Ms. Baraldini testified that:

I experienced periods of great depression. At one point I was so depressed, and this [was] where we really felt we would never get out, that I seriously consider[ed] and investigate[d] a way to commit suicide.... I went so far as to check out the pipes in the multi-purpose room and the sprinkler system in the cell to see if they would withstand the pressure.

(Px. 18 at 79.) Ms. Rosenberg testified that her capacity as a human being has diminished, that dependency upon the pris-

on staff has led to unbearable frustration, that the hopelessness of ever getting out of the Unit has caused great suffering, and that the isolation of the Unit is "punishment on punishment." (Px. 46 at 95, 96, 101, 103.) She related:

I think the other ... symptom is the loss or I perceive a loss in my ability to concentrate in an organized fashion ... I feel that the ... isolation is making me less than a human being.... I feel really disconnected at points from own life.... I recognize that in prison you can't control all aspects of your life. I know that.... I have been in prison ... long enough to understand that. But when you can't control anything on any level, it is out of your hands, the frustration is really unbearable.

(Px. 46 at 96.)

One of plaintiffs' experts, Gordon Kamka,[9] testified that the unit would not be proper for anyone because of the "debilitating effect of the institution, the harassment of staff, the sort of aggravation [plaintiffs] face on a daily basis, the fact that they have become extremely depressed and see no future and no way out." (Px. 84 at 97.) Louisa Brown, another expert,[10] described the Unit as a segregation unit because of the severe restrictions which were maintained. (Px. 78, Sec. 3, at 14.) She referred to the staff treatment as "subtle harassment," which over a period of time has the same effect as overt harassment: extreme frustration, tension, and low tolerance. *Id.* at 17–18.

The Court reviewed the deposition testimony of Mr. Kamka and Ms. Brown. Their credentials and professional experiences

9. Mr. Kamka has a graduate degree in Psychology from the State University of New York with post graduate studies in correctional administration. After more than eight years in the armed services, overseeing servicemen held in military confinement, he served for five years in Maryland's correctional system as a jail warden and as secretary of the Maryland Public Safety and Correctional Services. Since that time, he has provided criminal justice management consultation to several state correctional systems and private groups, and offered expert testimony in more than 40 prison cases. (Px. 67.)

10. Ms. Brown has a B.A. Degree in Psychology from the University of South Carolina and a graduate degree in Social Work from Tulane University. She has had extensive experience in the Department of Mental Health and the Department of Youth Services for South Carolina, and 15 years service with the South Carolina Department of Corrections as a warden for several state correctional institutions for both men and women. The institutions have ranged from minimum to maximum security facilities. (Px. 71.)

were impressive; their findings and conclusions deserve favorable consideration.

Robert Figelstahler, Manager of the Unit, admitted that he was aware of the inmates' various complaints involving psychological and physical ailments, but added that "while I am not a physician, I have observed no deterioration in [their] condition...." (Px. 92 at 3, ¶ 10.) When questioned at his deposition, he admitted receiving complaints about certain officers in the Unit (Px. 81 at 87) and recalled that at least one plaintiff had spoken to him about stress as a result of her life in the Unit. *Id.* at 179. He knew of numerous complaints regarding the patdowns and strip searches, but his memory was less certain whether they complained about the personal intrusiveness of the searches. *Id.* at 188–190.

The Court has little doubt that Unit Manager Figelstahler and other personnel at the High Security Unit were well aware of plaintiffs' various complaints regarding staff treatment and the psychological effects that they suffered.

■ The Supreme Court has stated that a prisoner attempting to prove a violation of the Eighth Amendment must show "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). She need not show that the prison officials had an express intent to inflict such pain. *Id.* at 104, 97 S.Ct. at 291. To be cruel and unusual punishment, conduct must involve more than ordinary lack of due care for the prisoner's safety and medical needs. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

■ Because the record is supported by strong evidence that the meals served in the Unit are prepared by a registered dietician and are more than adequate, the Court finds that plaintiffs have not been denied the basic nutritional necessities. The same is true with respect to their shelter. Their cells are 110 square feet, larger than most within the federal system, and complies with recognized standards. Recreational equipment, laundry facilities, and a variety of entertainment are provided. The Unit is clean and well-maintained. Plaintiffs' expert, Dr. Kamka, testified that "physically and technically you would find little to complain about." (Px. 84 at 78.)

While plaintiffs complain about health care, asserting inattention and slow responses by the medical staff, the record shows that a physician's assistant makes daily rounds and that doctors and dentists are seen on a regular basis. While it is clear that medical care is available, the length of time required to receive this care is hotly disputed. Ms. Baraldini complained of gynecological problems in February and March, 1988, yet it was not until the first week of June, that she received any attention for that condition. (Px. 18 at 83; Tr. of June 8, 1988, at 253.) Ms. Rosenberg has repeatedly asked for podiatry care, suffering as she does from a congenital foot problem. While she has received some attention, she continues to experience great difficulty with her feet (Px. 46 at 51) and the responses to her requests have not been instant. Defendants' counsel contend that inmate referrals to specialists are "at the sole discretion of the medical professionals at the Unit" and to date, "those professionals have not deemed a podiatric consult warranted for Ms. Rosenberg." Defts' Reply Br. at 19, June 23, 1988. This reply suggests to the Court that defendants' sluggish response to plaintiffs' requests borders very close to neglect.

The testimony showed that a psychologist, Dr. Mark Simpson, visited the Unit at least once a month. Plaintiffs Rosenberg and Baraldini testified that they refused to relate to him any of their psychological problems because they believe that they are subject to a psychological experiment and do not want to participate in the study or encourage the Bureau in its efforts. (Px. 46 at 99–100; Px. 18 at 84.)[11] Dr.

---

11. Ms. Rosenberg testified that "because of the

conditions and because of the treatment in a

Stuard Grassian,[12] plaintiffs' expert psychiatrist, gave detailed deposition testimony regarding the plaintiffs' psychological condition. He stated that the three plaintiffs showed symptoms in the areas of sensory disturbance, perceptual distortions, affective disturbances, concentration difficulties, and obsessive preoccupations. (Px. 82 at 48–50.)

The Court is well aware that expert opinion regarding prisoners' Eighth Amendment claims have been recently criticized by this Circuit in *Occoquan*, 844 F.2d at 836–37, *supra* at pp. 436–37. Under that decision, a trial court must go beyond expert testimony and find conditions that fall below fundamental human needs. Based on the record developed in this proceeding, plaintiffs have presented problems which should not be ignored but they have not shown that they have been denied the essential mainstays of life. A prison sentence should not be equated with a stay at a vacation resort.

However, the Court is greatly troubled about the previous conditions within the Unit and the defendants' gross insensitivity and belated response to those conditions. The Unit at best meets the bare Eighth Amendment standards but at times the treatment of plaintiffs has skirted elemental standards of human decency. The exaggerated security, small group isolation, and staff harassment serve to constantly undermine the inmates' morale.

Defendants have acknowledged that many aspects of the Unit's present problems will hopefully be eradicated by the opening of a new high security female facility in Marianna, Florida, which is under construction. More than 100 women will be assigned to this larger unit, at the existing minimum security federal facility at Marianna. Director Quinlan gave deposition testimony that more than 100 women will be designated to the Marianna unit which will serve women classified from medium to high security. (Px. 87 at 95.) Both he and Assistant Director Ingram testified that the Marianna unit will provide greater freedom of movement, more educational programs, and a variety of additional opportunities for the inmates. *Id.* at 96; (Px. 83 at 81–82). Quinlan stated that the Marianna unit will be operated more like a general population institution. (Px. 87 at 96.) When asked if the women presently housed at the Lexington HSU would be designated to Marianna, Quinlan replied "Absolutely." *Id.* at 98.

With the plaintiffs' impending transfer to Marianna, their complaints about the conditions at Lexington will be moot. Because the population will be larger and the women will be allowed to mingle and interact with each other, they should not suffer from the psychological effects associated with small group isolation. Director Quinlan testified that once the women arrived at Marianna, they would not be separated into smaller units. *Id.* at 109. Other problems may remain, however, since the Bureau is committed to "transferring the mission" of the HSU to Marianna. (Px. 83 at 84.) If the Bureau continues to use the same vague criteria for removal, it may perpetuate the stress identified by the defendants' own expert, Dr. Logan.[13] The defendants must be extremely careful that Marianna's

---

hostile environment, I didn't want to voluntarily give information about what was happening in the most personal and subjective level to me to the people that I feel are out to do me in." (Px. 46 at 99–100.) Ms. Baraldini gave deposition testimony that "it had been my practice not to talk to the psychological staff since I've been in prison because I didn't want to—my life or my thoughts and feelings to appear in some psychological paper or psychological profiles of political prisoners." (Px. 18 at 84.)

12. Dr. Grassian has an undergraduate degree from Harvard and graduated from the New York University School of Medicine. Following a residency and a clinical fellowship in psychia-

try, he has been engaged in private practice as well as teaching assignments at several medical schools and hospitals. He has studied and written extensively about the effects of restrictive confinement on persons incarcerated in prisons.

13. In a March 7, 1988, letter to Assistant Director Ingram, Dr. Logan reported some of his "general observations" about the "physical accommodations" of the Lexington Unit. He wrote: "Once placed on the unit, criteria for removal is vague.... The uncertainty of the women's status undoubtedly does constitute a stress upon them." (Px. 62 at 4.)

conditions and staff behavior do not lead to wanton and unnecessary infliction of psychological pain in violation of the Eighth Amendment.

## C. FIFTH AMENDMENT CLAIMS

Plaintiffs acknowledge the Due Process Clause does not require a hearing before an inmate is transferred to a different facility or assigned to administrative segregation. Plaintiffs argue, however, that the Clause is implicated when assignment to a facility violates a prisoner's other constitutional rights. Because they believe they were transferred to the Unit in violation of their First Amendment rights, plaintiffs claim that they should have been afforded a pre-transfer hearing.

■ It is well-established that an inmate has no right to be incarcerated in any specific institution. Therefore, due process imposes no procedural requirements upon the transfer of an inmate to another institution. This is true even if the transfer involves a substantial change in the conditions of confinement and is based upon what are believed to have been specific acts of misconduct by the inmate. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed. 2d 451 (1976); *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

■ The Due Process Clause does not protect a prisoner's interest in remaining at a specific prison, *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), nor do prisoners possess a "liberty" interest in continued confinement in the general prison population rather than in administrative segregation. *Hewitt v. Helms,* 459 U.S. 460, 466–68, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). "Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections...." *Meachum,* 427 U.S. at 228, 96 S.Ct. at 2540.

There are a few narrow instances when procedural rights are available to a prisoner: prior to transfers to a mental institution, *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) and before being deprived of "good time" earned, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Even when a hearing is required, the Court has stated that prison authorities have the discretionary right to narrowly limit the procedures afforded to the inmate. *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *Baxter v. Palmigiano,* 425 U.S. 308, 321–22, 96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810 (1976).

■ Because there is no "liberty interest" in continued confinement in the general female prison population, and the plaintiffs' transfers to the HSU do not fall in the above limited categories, the Court holds that plaintiffs have failed to show a violation of the Due Process Clause.

## III.

## CONCLUSION

The Bureau of Prison's criteria for assigning women to the Lexington High Security Unit violate plaintiffs Baraldini and Rosenberg's First Amendment rights. The criteria sweep within their ambit protected expressions and associations. They blur the line between those inmates chosen for the Unit and those who remain in the general prison population. They specifically punish Baraldini and Rosenberg for their "radical" political beliefs and their alleged associations with "revolutionary" political organizations. While numerous women with escape histories remain housed in the general prison population, Baraldini and Rosenberg have been singled out for advocating ideas disagreeable to the government. The Female High Security Unit is an exaggerated response to the defendants' penological concerns and violates plaintiff Baraldini and Rosenberg's First Amendment rights.

Plaintiffs' Eighth and Fifth Amendment rights, however, have not been violated. The present physical conditions of the High Security Unit do not rise to the level of wanton and unnecessary infliction of pain. The Due Process Clause does not require

that plaintiffs be given a hearing prior to their transfer to the Unit.

It is one thing to place persons under greater security because they have escape histories and pose special risks to our correctional institutions. But consigning anyone to a high security unit for past political associations they will never shed unless forced to renounce them is a dangerous mission for this country's prison system to continue. In light of the Bureau's statement that it intends to "transfer the mission" of the High Security Unit to the new security unit at Marianna, Florida, this Court is afraid that the Marianna facility will automatically assume many of the problems haunting the Lexington Unit.