**Silvia BARALDINI, et al.**

v.

**Richard L. THORNBURGH, Attorney General, et al.**

No. 88–5275.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1989.

Decided Sept. 8, 1989.

John C. Cleary, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellants.

Adjoa A. Aiyetoro, with whom Alexa P. Freeman, Jan Susler, Michael Deutsch, Chicago, Ill., Mary K. O'Melveny, New York City, and Margaret L. Ratner were on the brief, for appellees.

Before EDWARDS and RUTH BADER GINSBURG, Circuit Judges, and KAUFMAN, Senior United States District Judge.[*]

Opinion for the Court filed by Senior United States District Judge KAUFMAN.

FRANK A. KAUFMAN, Senior District Judge:

This appeal raises the question whether the Federal Bureau of Prisons ("the Bureau") violated the First Amendment rights of plaintiffs-appellees, Silvia Baraldini and Susan Rosenberg, by placing them as inmates in the Bureau's highest security confinement institution for women. The District Court answered that question in the affirmative and granted injunctive relief to those two plaintiffs. *Baraldini v. Meese,* 691 F.Supp. 432 (D.D.C.1988). We disagree and reverse.[1]

## I.

In October 1986, the Bureau opened the Female High Security Unit within the Federal Correctional Institution at Lexington, Kentucky ("the Unit"). Prior to that time, the Bureau did not have a high security place of confinement for women. On September 2, 1986, a high official of the Bureau wrote in an internal Bureau memorandum:

> Candidates for placement in this unit are those females whose confinement raises a serious threat of external assault for the purpose of aiding the offender's escape. Other females who have serious histories of assaultive, escape-prone or disruptive activity may be considered on a space available basis.... Consideration for transfer from the unit should be given when the original factors for placement in the unit no longer apply and when placement in a less secure facility becomes appropriate.

*Baraldini v. Meese,* 691 F.Supp. at 435.

Prior to the entry of the injunction by the District Court in July 1988, seven women, including Baraldini, Brown and Rosenberg, had been assigned to the Unit. As of March 1, 1988, three weeks before this action was instituted, those three women plus two others, or a total of five, were so confined.

Silvia Baraldini received a forty-year prison sentence after her 1984 conviction for racketeering, conspiracy and armed

---

[*] Of the United States District Court for the District of Maryland, sitting pursuant to 28 U.S.C. § 294(d) (1982).

[1] This case was instituted in the District Court by three women, claiming violations of their rights under the First (freedom of association), Fifth (due process) and Eighth (cruel and unusual punishment) Amendments. The District Court denied all relief sought by the third plaintiff, Sylvia Brown, and also denied the relief sought by Baraldini and Rosenberg on Fifth and Eighth Amendment grounds. No appeals have been filed by Baraldini, Brown or Rosenberg from those denials. This appeal is brought solely by the defendants, the Attorney General of the United States and the Director and several other officials of the Bureau from the relief granted by the District Court to Baraldini and Rosenberg upon First Amendment grounds.

robbery.[2] Prior to her transfer to the Unit in January 1987, Baraldini was confined in the general population of non-maximum security institutions without any unusual security, behavioral or other similar problems. Her January 1987 transfer papers stated:

> Ms. Baraldini is a member of the May 19th Communist Party which is sympathetic to other radical groups including the New African Freedom Front and the FALN. She participated in the successful 1978 escape of Jo Anne Chesamire [sic] from the New Jersey State Women's Prison. Members of her group have participated in numerous armed robberies where police officers were wounded or killed.

*Id.* at 436. In addition, Baraldini's transfer papers noted her association with the "Family"—"a revolutionary organization whose members advocate the overthrow of the U.S. government through violent means." *Id.* (page references omitted).

Susan Rosenberg was sentenced in 1985 to fifty-eight years for conspiracy to possess unregistered firearms, unlawful use of false identification documents and possession of unregistered destructive devices. One of the first to be assigned, Rosenberg was sent to the Unit in October 1986. Before that transfer, the record contains no suggestion that Rosenberg presented any particular security, behavioral or other similar problems after she was sentenced in 1985. It was noted in the Bureau document requesting her transfer that

> Rosenberg has been associated with the FALN, Black Liberation Army, and other terrorist groups. She also was thought to have been involved in an 1981 Brinks Armed Car Robbery and has previously been linked to the Joanne Chesimard escape in 1979. She also has threatened in

open court to take her armed revolution behind prison walls. For the above reasons, we are referring her to a maximum security institution.

*Id.* After Rosenberg was sentenced, the sentencing judge, in a letter to the Director of the Bureau, reviewed the in-court statements of Rosenberg and a co-defendant, and stated that "the defendants exhibited no remorse. To the contrary, they exhorted their followers who were present in court to carry on the 'armed revolution.'" *Rosenberg v. Meese,* 622 F.Supp. 1451, 1464 n. 22 (S.D.N.Y.1985) (quoting from a May 21, 1985 letter of the sentencing judge, Frederick B. Lacey, United States District Judge for the District of New Jersey, to the then Bureau Director, Norman A. Carlson). The sentencing judge added that "[c]areful consideration must be given to the security of any prison to which Rosenberg is sent." *Id.*[3]

Sylvia Brown was sentenced in 1980 to a term of more than twenty years for interstate kidnapping, probation violations and prison escapes. While in federal confinement, she was twice transferred for disciplinary reasons and at one point escaped and was subsequently apprehended. Her escape was accomplished with "organized outside assistance, including payments of money, transportation arrangements, and sophisticated weapons." *Baraldini v. Meese,* 691 F.Supp. at 436. When Brown was transferred to the Unit in 1987, an internal Bureau document referred specifically to her escape.

## II.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). However, "courts are ill

---

**2.** Baraldini was sentenced to an additional three years for criminal contempt, arising out of her refusal to testify concerning alleged FALN bombings at the New York Stock Exchange, the American Stock Exchange, the Chase Manhattan Bank and Merrill Lynch. FALN is the Fuerzas Armadas de Liberacion Nacional Puertorriquena (Armed Forces of Puerto Rican National Independence), which seeks the independence

of Puerto Rico and is associated with the use of violence.

**3.** In *Rosenberg v. Meese,* Rosenberg unsuccessfully stated certain constitutional challenges, including First Amendment claims, in connection with her federal confinement after her sentencing by Judge Lacey and before her transfer to the Unit in October 1986.

equipped to deal with the increasingly urgent problems of prison administration." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). In *Turner*, Justice O'Connor, for the majority, wrote:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities.

*Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259. In that context, Justice O'Connor "formulate[d] a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.' " *Id.* at 85, 107 S.Ct. at 2259, *quoting Martinez*, 416 U.S. at 406, 94 S.Ct. at 1808. The standard specifically formulated by the Supreme Court in *Turner* is that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261, *quoting Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977).[4] Justice O'Connor then added:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id., quoting Martinez*, 416 U.S. at 407, 94 S.Ct. at 1808. Justice O'Connor then set forth, 482 U.S. at 89–91, 107 S.Ct. at 2261–63, four factors relevant to determination of the "reasonableness" of a prison practice. Judge Parker, in the District Court, accurately stated those factors as follows:

> 1) Whether there is a "valid, rational connection" between the prison regulation and the legitimate, neutral governmental interest.
>
> 2) If alternative means of exercising the constitutional right remain open to prison inmates.
>
> 3) The impact an accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources.
>
> 4) The absence of ready alternatives.

*Baraldini v. Meese*, 691 F.Supp. at 443.

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), in a five-four decision, Chief Justice Rehnquist reaffirmed the *Turner* standard and added:

> This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," [*Turner*, 482 U.S. at 89, 107 S.Ct. at 2261], and avoids unnec-

**4.** *Turner* presented a challenge on First Amendment grounds to Missouri prison regulations restricting correspondence between inmates in different confinement institutions, and containing a ban on prisoner marriages. All nine justices of the Supreme Court joined in striking down the marriage ban as not "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 97, 107 S.Ct. at 2266. However, as to the correspondence regulation, the majority opinion of five justices, over the dissent of four others, held the restriction constitutional.

essary intrusion of the judiciary into problems particularly ill-suited to "resolution by decree."

*O'Lone*, 482 U.S. at 349–50, 107 S.Ct. at 2204, *quoting Martinez*, 416 U.S. at 405, 94 S.Ct. at 1807. The Chief Justice also wrote:

> We think the Court of Appeals decision in this case was wrong when it established a separate burden on prison officials to prove "that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems." 782 F.2d, at 420. *See also id.*, at 419.... By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.

*O'Lone*, 482 U.S. at 350, 107 S.Ct. at 2405.[5]

In *Thornburgh v. Abbott*, — U.S. —, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989),[6] Justice Blackmun noted that "[t]here is little doubt that the kind of censorship just described would raise grave First Amendment concerns outside the prison context," *id.* at 1878; he nonetheless concluded that under the "reasonableness" standard articulated in *Turner*, as opposed to *"Martinez'* less deferential approach ... [which] might be ... understood as establishing a standard of 'strict' or 'heightened' scrutiny," *id.* at 1879, the regulations there under challenge could survive.[7]

### III.

The District Judge concluded, after a review of the record,[8] that "[e]very document used to support the transfers of plaintiffs Baraldini and Rosenberg concentrates on their political views and associations ... [showing that] the Bureau is clearly concerned with the ideologies of those groups ... [and] the content of [plaintiffs'] expressions." *Baraldini v. Meese*, 691 F.Supp. at 443. While the Director of the Bureau, in a letter to a congressman in 1988, recognized that the criteria for assigning women prisoners to the Unit "could have been more appropriately stated," the Director further stated:

> Categorically, prisoners are not assigned to this or any unit on the basis of their political beliefs or ideology. We recognize that assigning prisoners to any unit on this basis would be entirely inappropriate. This does not mean that we ignor [sic] the history and activities of groups to which the individuals belong, even though that affiliation may be for ideological reasons. Beliefs, whether political [sic] religious, or ideological, do not immunize activities which pose threats to the safety and well-being of others.

*Id.* at 438.

Baraldini and Rosenberg, as opposed to Brown, have not been involved in any attempt to escape since their federal confinement commenced. The District Court concluded that the "designations" of Baraldini and Rosenberg to the Unit were made "solely for their 'subversive' statements and thoughts." *Id.* at 443.

Our own reading of the record is different. While the Bureau certainly took into account the views of Baraldini and Rosenberg and the programs of the organizations of which they had been active members before their federal confinement, the Bu-

---

**5.** *O'Lone* was concerned with New Jersey state prison regulations regarding when and where prisoners worked, which effectively made it impossible for Muslim inmates to attend weekly religious services within certain prison buildings.

**6.** In a six-three opinion, Justice Blackmun, who had dissented in *Turner* and *O'Lone* along with Justices Brennan, Marshall and Stevens, joined Chief Justice Rehnquist and Justices White, O'Connor, Scalia and Kennedy in upholding the constitutionality of Bureau regulations empow-

ering wardens, subject to specific standards, to bar inmates from receiving certain publications.

**7.** In this appeal, in which First Amendment rights of association are asserted, it should be noted that, as Judge Mikva has written in *Palestine Information Office v. Shultz*, 853 F.2d 932, 941 (D.C.Cir.1988), even a person not in confinement has no "absolute" right to association and "limitations" may be placed on "free association conducted for an illegitimate purpose."

**8.** The record includes numerous documents, affidavits and question-and-answer testimony.

reau's focus was upon the policies and practices of those organizations to bring about prison escapes of their members and upon the capacities of those organizations to do so or to attempt to do so. A reviewing court must always be careful to make certain that prison administrators are not pretextually using alleged concerns in order to punish an inmate for his or her political or other views, or for past or present membership in organizations espousing anti-establishment or even governmental overthrow philosophies. There is, however, little or no basis in the context of this case to support the conclusion that the Bureau proceeded pretextually. Nor is there any evidence in this record that the Bureau singled out any woman for confinement in the Unit because her convictions emanated from the left wing of the political spectrum. Counsel for appellants conceded as much at oral argument. Rather, at all times, the Bureau was primarily concerned with the risk of escape with violent outside help, regardless of the political views of the inmates. The constitutional rights of Baraldini and Rosenberg to continue to hold violent, revolutionary views and/or to maintain their memberships in organizations dedicated to putting those views into practice do not require prison administrators to ignore those views and memberships in assessing the dangers of their escape from custody with outside help from those holding like views and/or memberships.

There is clear evidence that prior to and as of the dates of their respective convictions, both Baraldini and Rosenberg associated with groups which had assisted prison escapes. Those groups had access to dangerous weapons, and, in addition, both inmates had personally participated in the violent and criminal activities of those groups before their federal confinement.[9] During oral argument before us, counsel for Baraldini and Rosenberg seemingly conceded that the activities of those persons prior to confinement would have enabled the federal prison authorities to place them immediately after sentencing in a maximum security institution. However, appellees noted that the transfers occurred after a substantial period of incarceration during which the women had arguably been model prisoners. Nevertheless, behavior which led to an inmate's sentencing and imprisonment is just as relevant as behavior in prison to the Bureau's decisions concerning security needs during continuing confinement.

■ The record in this case establishes that there was a clear basis for the transfers of Baraldini and Rosenberg to the Unit, and that those inmates were not pressured into changing their views and/or organizational memberships in order to receive a lower security status. Obviously, however, if the Bureau officials had become convinced that a particular inmate would no longer be the willing or unwilling object of an attempt by others outside to achieve the inmate's violent escape from federal custody, that could be expected to have an impact upon the Bureau's assessment of security needs with regard to that inmate. While the Bureau's guidelines for transfer to and from the Unit are rather general, they are not incomprehensible and they do specifically relate to security needs, with references to "threat of external assault for the purposes of aiding the offender's escape" and to "serious histories of assaultive escape-prone or disruptive activity." Brief of Appellant at pp. 8–9, quoting a September 2, 1986 memorandum by Bureau Assistant Director G.L. Ingram.

■ Applying the first two factors set out in *Turner*, the transfers challenged in this case are rationally connected to a legitimate penological purpose and do not unduly restrict alternative means of exercising association rights. As to the third *Turner* factor, the danger that Baraldini and/or Rosenberg would be aided to escape by violent outside help would obviously have serious effects upon guards and other inmates, as well as upon the allocation and use of prison resources. The fourth *Turner* factor requires an assessment of the

---

**9.** Unlawful purposes motivating the conduct of groups and individual members of groups need not be ignored in balancing First Amendment rights of association against the needs of law enforcement. *See Palestine Information Office v. Shultz,* 853 F.2d at 941.

presence or absence of ready alternatives to the challenged action. It is often possible to contend, as do appellees, that the Bureau's decision—here, to transfer Baraldini and Rosenberg to the Unit—constitutes an "exaggerated response" to the Bureau's security concerns. *See Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262–63; *Baraldini v. Meese*, 691 F.Supp. at 443. Judge Parker, in the District Court, concluded that the Bureau did respond on an exaggerated basis in this case. On appeal, however, that determination qualifies for de novo review. *Cf. Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). It is our obligation to assure that the District Court does not substitute its preferred course of action for a course of action reasonably taken by the Bureau. Ultimately, the record in this case leads us unavoidably to this conclusion: the District Court's determination that the transfers of Baraldini and Rosenberg to the Unit were based "solely" upon the " 'subversive' statements and thoughts" of those two inmates, *Baraldini v. Meese*, 691 F.Supp. at 443, is clearly erroneous.

Accordingly, we reverse the judgment of the District Court and remand this case with instructions to annul the decree accompanying that judgment and to enter judgment for defendants.