Lorenzo JOHNSON, Plaintiff,

v.

Rick RAEMISCH, Dane Westfield and Mike Thurmer, Defendants.

No. 07–cv–390–bbc.

United States District Court, W.D. Wisconsin.

May 23, 2008.

Lorenzo Johnson, Waupun, WI, pro se.

David Hoel, Wisconsin Department of Justice, Madison, WI, for Defendants.

## OPINION AND ORDER

BARBARA B. CRABB, District Judge.

This is a case about dissent. In particular, it requires this court to determine the extent to which prisoners retain the right under the First Amendment to speak and read about ideas that are critical of those who incarcerate them. Plaintiff Lorenzo Johnson is a Wisconsin prisoner and subscriber to *The New Abolitionist,* a newsletter addressing prisoner rights issues. In the context of providing information about Wisconsin prisons, the newsletter offers commentary that is critical of policies and practices of Wisconsin prison officials. Defendants blocked the delivery of this newsletter to plaintiff, concluding that certain passages were "inflammatory" and would "encourage disrespect" and "hopelessness."

■ Plaintiff has sued defendants under 42 U.S.C. § 1983, contending that their censorship of the newsletter violated his First Amendment right to free speech. The parties' cross motions for summary judgment are now ripe for review. Defendants' motion for summary judgment will be denied and plaintiff's motion will be granted. Even under the deferential standard of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), defendants' censorship of the newsletter cannot survive scrutiny. Many of defendants' reasons for denying plaintiff the newsletter suggest that it was the critical nature of the newsletter that prompted the decision rather than any true interest in security or rehabilitation. Even if defendants' concerns were genuine, their justifications amount to nothing more than "because we said so," which is not enough to pass constitutional muster. Any other conclusion would threaten the right of prisoners to criticize government officials, a result that cannot be squared with the First Amendment.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff Lorenzo Johnson is a prisoner at the Waupun Correctional Institution in Waupun, Wisconsin. In 2007, petitioner subscribed to the newsletter of the Prisoner Action Coalition, which is called *The New Abolitionist.* He did not receive a copy of the March 22, 2007 edition of the newsletter because it was censored by defendant Dane Westfield.

Defendant Westfield is the security chief for the Wisconsin Department of Corrections. His duties include reviewing publications that have been sent to prisoners and determining whether they should be censored. One of these publications was the March 22, 2007 edition of *The New Abolitionist.* That newsletter included several different articles related to prisons in Wisconsin, including:

- an update on recent events such as the new settlement agreement in *Jones 'El v. Schneiter,* 00–C–421–C (W.D.Wis.), and an upcoming legislative hearing about the parole commission;
- a letter to the chairperson of the parole commission from one of the contributors to the newsletter;
- a report on a recent forum on "Wisconsin's Correctional Future";
- a prisoner's perspective of the new *Jones 'El* settlement agreement;
- two news stories about prisoner civil rights cases that had settled;
- an interview with a member of the Wisconsin Assembly;
- two prisoners' perspectives of parole and classification decisions in Wisconsin prisons;
- a list of contact information for prison officials, politicians and prisoner rights advocates;
- an update on legal and political developments;

- a request for prisoner art to be displayed at an upcoming exhibit;
- a news story from Colorado about using prisoners to perform farm work traditionally performed by migrants.

After reviewing the newsletter, defendant Westfield concluded that prisoners should be prohibited from receiving or possessing it because of material he found objectionable in some of the articles. He relied on the following provisions of the Wisconsin Administrative Code:

> [T]he department may not deliver incoming or outgoing mail if it does any of the following:
>
> . . . .
>
> 8. Is "injurious", meaning material that:
>
> . . . .
>
> b. Poses a threat to the security, orderly operation, discipline or safety of the institution.
>
> c. Is inconsistent with or poses a threat to the safety, treatment or rehabilitative goals of an inmate.

Wis. Admin. Code § DOC 309.04.

> Section DOC 309.04 applies to receipt of publications. In addition, the department shall restrict receipt of publications by inmates as follows:
>
> . . . .
>
> (b) Inmates may not receive publications that:
>
> . . . .
>
> 4. Are injurious as defined in s. DOC 309.04(4)(c) 8.

Wis. Admin. Code § DOC 309.05.

The first article contained the following discussion of a modified settlement agree-

ment regarding the Wisconsin Secure Program Facility:

As it stands now, the entire Settlement Agreement is finished except for one year of monitoring by a panel of three psychiatrists. They will review all prisoners entering the Supermax [now called the Wisconsin Secure Program Facility]. There will be no evidentiary hearing after this period, no review, it's over, period.

The entire issue of the Level System (now called HROP) was washed away. The entire issue of due process—how guys ended up in Supermax—washed away. The entire issue of how guys stay in long term admin. seg. without periodic review, without a meaningful reevaluation from time to time, has been washed away. This decision is a travesty.

We have had word that DOC is looking for volunteers to fill the Charlie unit cells at Supermax. No school, no work, no cafeteria, less canteen, no contact visits, no storage for property, tiny cells, and the close proximity of the revolving door to the dungeons, all sound enticing don't they? I'm sure guys will be lining up for a vacation in SW Wisconsin, even further away from their families. Don't fall into the trap!

Defendant Westfield concluded that this article contained inaccurate information about the conditions of the Wisconsin Secure Program Facility that would "discourage" prisoners "from taking advantage of basic education opportunities at WSPF and interfere with their rehabilitation and program completion."

One of the prisoner's articles on the Wisconsin parole and classification decisions contains the following discussion:

For many of you reading this, you may comprehend where I am coming from when it comes to the imbecilic totalitari-

an decisions made by the parole board & the PRC personnel staff in prison who are clueless as to what they are doing, or are they?

Before I go any further regarding the above abusers of prisoners & prisoner families, I would like to address something.

We have the power, we have the upper hand to make a change. . . . We, as prisoners, may not be able to vote, but we sure as hell can have our families & friends vote on our behalf & elect the right person(s) to the senate.

If we work together, we can get things accomplished. If Prisoners Action Coalition (PAC), Forum For Understanding Prisons (FFUP) and many other organizations unite and spread this message, I can only guarantee changes and results, so we must begin by getting rid of the problem & finding a solution.

It doesn't take a genius, fancy words or the printing of a long article when it comes to the parole board. The problem is very simple, no matter [whether you're] under the old law, you may as well fall under the truth in sentencing laws. I mean let us not forget about the crook Governor Tommy Thompson who put a lot his directives into motion.

. . . .

Programs are being denied to prisoners for no legitimate reason at all. . . . [T]he Program Review Committee . . . is a group of inexperienced people who think alike. The most we can do is harass the hell out of the system & expose them by putting our stories on internet blogs, newsletters, have friends and families call and write letters on your behalf every week until somebody listens, because truth is not only violated by false-

hood; it may be equally outraged by silence.

According to defendant Westfield, these statements are "inflammatory," "encourage disrespect" and "encourage hopelessness" because they could lead prisoners to believe they will be unable to obtain early release. The hopelessness and disrespect could then lead prisoners "to distrust staff and act out" and "subvert [their] appreciation of the value of good behavior and program participation in furtherance of their rehabilitation."

In the other prisoner's article on parole decisions, the prisoner discussed a decision denying his parole that was later overturned because the review committee had falsely represented department regulations. He wrote:

> The purpose of this letter is to show the deceiving and manipulative tactics which are fabricated stories by PRC at RGCI [Red Granite Correctional Institution] is using to keep us longer than possible.... I completed my recommended treatment programs & the recommendation by the parole board was never even considered by the PRC at RGCI, because PRC at RGCI make up their own rules, policies & quash any recommendations made by the parole commissioner.

According to Westfield, this article is "inflammatory" and "encourages distrust of staff" and "unrest" and "hopelessness" among prisoners. Westfield believes the article could lead to "group resistance and other bad behavior."

Another prisoner's article includes the following discussion:

> Some additional good news is Comrade Gillis, for those of you who remember, just won his appeal in the 7th Circuit regarding the "Behavior Modification Program" at the Supermax. Well the WDOC, rather than go to trial, decided to settle the case. So he settled for a nice sum, and, after speaking with me, has agreed to send a real nice donation to PAC to assist in the struggle. This summer will be the time for us to make some noise, if we want to make any progress. The political winds are changing to where [if] we have the organization to make some noise, we can at least get an ear from the "system" and can infuse some enlightenment. No matter what one's view may be on politics, no one can deny the last 15 to 17 years were ruled by extreme right wing Neo–Cons, who put their plan into effect to wipe out what they termed the "useless eaters." Or "Non-productives" of society, and while they were doing it, made large sums of money and power. This is why we had the private prison boom in the 90's.

The prisoner goes on to suggest that other prisoners may rely too heavily on the courts to seek change:

> This [reliance on the courts] blinds brothers to other avenues that are now open and have a better chance of success. It was apparent most inmates are unaware how much politics play in all aspects of their lives. They wonder how and why the 303 administrative code got changed to where it's now gutted and have no protections for abuse of power by these prison security staff. They wonder how and why these new truth-in-sentencing laws came into effect and how they spend 20 and 30 years in prisoner with no chance of parole. They wonder how and why prison staff can take all your books, shut down your knowledge, and take away what "rights" you have left as a human being. So when it happens, the inmates want to run to the court seeking justice, not realizing that the laws are no longer there.... [T]he last Parole Board Chairman, Leonard Wells ... tried to

do the right thing and was run out of office by powerful forces, who were benefitting from the prison industrial complex, i.e., police unions and guard unions and we as inmates have no counter balance to fight with. It's about POWER. So of course we must employ any and all means necessary, but if you want the courts to work for you, then you have to have some type of political power.

So you may ask, how do you get political power? The answer is unity of one purpose or case. Then you must display it. . . . [I]f the PAC can get the buses, and equipment, such as signs, food and other necessary items, if we can organize mass marches and protests not only in Madison, but also in front of some of these prisons that are abusing inmates, we can bring some attention to this madness they call prison life.

. . . We have to make some noise this summer with our friends and families holding mass rallies and marches . . . So do you what you can get in getting your friends and loved ones involved. Just ask them if they will be willing to come march and attend rallies and give other support, if called upon.

Defendant Westfield believes that this article's characterization of prison disciplinary procedures to be false. In addition, he believes it "raises security and rehabilitation concerns" because it encourages "group resistance," "violent self-help remedies by prisoners who feel threatened," "distrust of staff, paranoia, and a sense of grievance and hopelessness in prisoners."

Some prisoners in the Wisconsin Department of Corrections received their copy of the March 22 newsletter. However, plaintiff received a notice from defendant Westfield that the newsletter would not be delivered to him. The notice stated that the newsletter "poses a threat to the security, orderly operation, discipline/safety of the institution." Plaintiff filed a grievance, which was denied by the inmate complaint examiner: "The publication in question has been reviewed by the DAI security chief and is prohibited per DOC 309.05(2). The publication contains the newsletter of The Prisoners' Action Coalition; therefore, the complainant is not permitted to possess the material."

Plaintiff appealed the grievance to defendant Mike Thurmer, the warden of the prison, and defendant Rick Raemisch, who was the deputy secretary of the Wisconsin Department of Corrections. Both Thurmer and Raemisch approved the denial of the grievance without explanation.

## OPINION

The history of the United States is in many ways a history of voicing dissent. As one former President noted: "Here in America we are descended in blood and in spirit from revolutionaries and rebels—men and women who dared to dissent from accepted doctrine." Dwight Eisenhower, Address at Columbia University (1954). Dissenters have contributed to American democracy by forcing the majority to articulate justifications for widespread practices and by exposing the weaknesses of long held beliefs. Cass Sunstein, *Why Societies Need Dissent* 210–11 (2003). Without dissenters, we may never have had movements leading to the emancipation of slaves, the right of women to vote and the end of de jure segregation in the nation's public institutions. We would never be able to see when the emperor has no clothes. "Without debate, without criticism, no administration and no country can succeed—and no republic can survive." John F. Kennedy, Address to the American Newspaper Publishers Association, New York City (Apr. 27, 1961). Because of the important role that dissent plays in

American democracy, President Eisenhower asked the American people to "never confuse honest dissent with disloyal subversion."

The central importance of dissent in America is reflected not just in history, but in the Supreme Court's free speech jurisprudence. In fact, the Court has recognized that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Dissent must not only be tolerated, but celebrated because the freedom to dissent is what separates the United States from the regimes that came before it. *Grosjean v. American Press Co.*, 297 U.S. 233, 245–249, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (summarizing Britain's history of suppressing criticism of government and noting that First Amendment was response to this); *see also New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("debate on public issue should be uninhibited, robust, and wide-open"). When dissent is crushed, it may quickly lead to more abusive measures: "Once a government is committed to the principle of silencing the voice of opposition, it has only one way to go, and that is down the path of increasingly repressive measures." Harry S. Truman, Message to Congress (Aug. 8, 1950). *See also* Sunstein, *supra* at 6 ("When injustice, oppression, and mass violence are able to continue, it is almost always because good people are holding their tongues.")

Thus, if plaintiff were a free citizen, this would be the easiest of cases. The United States Reports are filled with decisions in which the Supreme Court has held that the government may not suppress criticism of public officials, no matter how harsh or unpopular, even in times of social upheaval and even when the statement is inaccurate. *E.g., West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (government may not compel students to salute American flag); *Craig v. Harney*, 331 U.S. 367, 383, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) (Murphy, concurring) ("Any summary suppression of unjust criticism carries with it an ominous threat of summary suppression of all criticism. It is to avoid that threat that the First Amendment, as I view it, outlaws the summary contempt methods of suppression."); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) ("Speech is often provocative and challenging .... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."); *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("erroneous statement is inevitable in free debate, and it must be protected if the freedoms of expression are to have the 'breathing space' that they need ... to survive"); *New York Times*, 376 U.S. at 270, 84 S.Ct. 710 (speech protected even when it includes "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (striking down law that prohibited use of "obscene or opprobrious language" to police officer); *Boos v. Barry*, 485 U.S. 312, 316, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (striking down law that prohibited signs that bring foreign government "into public disrepute" over objection that protecting dignity of foreign diplomats by shielding them from criticism of their governments is compelling interest); *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (government may not criminalize desecration of American flag); *Bartnicki v. Vop-*

*per,* 532 U.S. 514, 534–535, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) ("It was the over-riding importance of that commitment [to public debate] that supported our holding that neither factual error nor defamatory content, nor a combination of the two, sufficed to remove the First Amendment shield from criticism of official conduct."). The right of a nonprisoner to read or distribute a newsletter such as The New Abolitionist is so clearly established that any argument to the contrary would be legally frivolous.

■ Of course, this does not necessarily mean that plaintiff must prevail. As I noted in *West v. Frank,* 492 F.Supp.2d 1040, 1044 (W.D.Wis.2007), "in the prison setting, all bets are off when it comes to how and to what extent the First Amendment should be applied." Prisoner claims under the First Amendment are not ana-lyzed under the strict scrutiny review that nonprisoners' claims ordinarily receive. Rather, restrictions on a prisoner's right to free speech are constitutional unless they are not "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Although the standards of review are different, the right to dissent is no less important in the prison setting than it is in the free world. As the Supreme Court has recognized, "[i]n the prison context ... the government's power is at its apex." *John-son v. California,* 543 U.S. 499, 511, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). If a prison official abuses that power, there are few places to which a prisoner may turn for assistance, both because of the prison-er's dependence on his custodians and be-cause his ability to participate in the politi-cal process is so much more constrained than a free person. If a prisoner is stifled in airing his grievances with prison offi-cials, he has no other way of seeking

change. *Cf. McCarthy v. Madigan,* 503 U.S. 140, 153, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Because a prisoner ordinarily is divested of the privilege to vote, the right to file a court action might be said to be his remaining most fundamental politi-cal right, because preservative of all rights.") (internal quotations omitted).

■ Under *Turner,* 482 U.S. at 90, 107 S.Ct. 2254, prison regulations must operate in a neutral fashion, without regard to the content of the expression. This is an im-portant limitation on prison officials' au-thority of censorship. Although the Court has invalidated few prison restrictions over the years, it has consistently stated that prison officials may not censor statements simply because the statements are critical. An attempt to immunize oneself from pub-lic scrutiny is not a legitimate penological interest. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (striking down prison regulation that cen-sored "statements that 'unduly complain' or 'magnify grievances,' expression of 'in-flammatory political, racial, religious or other views,' and matter deemed 'defama-tory' or 'otherwise inappropriate' "); *Pell v. Procunier,* 417 U.S. 817, 830–831, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (uphold-ing restrictions on press access to prison-ers after noting that "regulation is not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions"); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128–129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (noting "reasonable assumption that each individual prisoner [may] believe what he cho[oses] to believe, and that out-side individuals should be able to commu-nicate ideas and beliefs to individual in-mates"); *Thornburgh v. Abbott,* 490 U.S. 401, 421–22, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (Stevens, concurring in part)

(First Amendment would protect right of prisoner to receive article containing harsh criticism of medical treatment provided to prisoners). *Cf. Ex Parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (invalidating rule requiring prisoners to get warden's approval before filing petition for writ of habeas corpus). *See also Baraldini v. Thornburgh*, 884 F.2d 615, 620 (D.C.Cir.1989) ("A reviewing court must always be careful to make certain that prison administrators are not pretextually using alleged concerns in order to punish an inmate for his or her political or other views.")

In this case, defendants do not deny that the vast majority of the content in the newsletter is unobjectionable. Much of it consists of little more than news updates of events relating to Wisconsin prisoners, important information to many prisoners that they otherwise would not receive. Most of the statements to which defendants do object are contained in commentary that is critical of Wisconsin prisons and the state's parole practices: criticisms of the treatment of prisoners generally, the conditions at the Wisconsin Secure Program Facility and the parole commission and former governor Tommy Thompson. The remaining statements are calls to action, asking readers and their friends and family to get politically involved. To the extent that defendants censored the newsletter to suppress these views, their reasons are not valid.

The record contains some support for an argument that defendants were targeting the viewpoint of the speaker: when plaintiff filed a grievance about not receiving the newsletter, the only explanation he received was that he was "not permitted to possess the material" because "[t]he publication contains the newsletter of The Prisoners' Action Coalition." Neither defendant Thurmer nor defendant Raemisch identified any security justification for the censorship when they affirmed the denial of the grievance. Even defendant Westfield, when informing plaintiff that the newsletter was being censored, said only that the newsletter "poses a threat to the security, orderly operation, discipline/safety of the institution."

It does not help defendants to say that some of the opinions expressed in the newsletter are "inflammatory." As held by the Court in *Procunier*, 416 U.S. at 415, 94 S.Ct. 1800, prohibiting "inflammatory" prisoner speech "fairly invite[s] prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship [and] to suppress unwelcome criticism." (Although the Court has limited the reach of *Procunier* in subsequent cases such as *Turner* and *Thornburgh*, these limitations relate to the standard of review only. The Court has never repudiated *Procunier's* holding that prison officials may not censor speech simply because they deem it to be "inflammatory.")

■■ Defendants advance a number of ostensibly neutral reasons for the censorship but none survives scrutiny under *Turner*. The standards for reviewing free speech restrictions on prisoners are more deferential but they are not "toothless." *Thornburgh*, 490 U.S. at 414, 109 S.Ct. 1874. "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *see also Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)("[D]eference does not imply abandonment or abdication of judicial review.") When a court finds that a restriction on a prisoner's speech is an "exaggerated response" to any legitimate concerns,

the restriction cannot stand. *Turner*, 482 U.S. at 91, 107 S.Ct. 2254.

Defendants say first that many of the passages foster "disrespect," but this could be so only if one equates a strong critique with disrespect. The newsletter did not engage in gratuitous name calling as in *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir.1986), in which the court upheld the discipline of a prisoner who called prison officers "stupid lazy assholes" and implicitly threatened the officers by telling them to "bring their fat asses around the gallery at night." I discussed the difference between criticism and disrespect in *Walker v. Bertrand*, Case. No. 01–C–95–C, 2003 WL 23100275, *4–5 (W.D.Wis. Apr.1, 2003), in which I upheld the discipline of a prisoner who had "wished a fatal accident" on the warden in a grievance he filed:

> If all criticism is considered disrespectful, then prisoners' ability to seek change within the prison becomes severely constrained and the relationship between the regulation and the need to maintain order is diminished if not extinguished. The result of this case might have been different if plaintiff had been disciplined solely for writing to defendant Bertrand, "you don't follow your own rules." Although prison officials must "remain the primary arbiters of the problems that arise in prison management," *Shaw*, 532 U.S. at 230, 121 S.Ct. 1475, they cannot immunize themselves from legitimate dissent. In this case, however, it is clear that plaintiff's comments went well beyond criticism. Plaintiff was complaining about his cell assignment; wishing defendant Bertrand a "fatal accident" was not germane to the complaint.... [Plaintiff] had ample alternatives to express his dissatisfaction without also expressing a wish for the warden's imminent death.

Defendants point to nothing in the newsletter that resembles the speech at issue in *Ustrak* and *Walker*. The authors of the newsletter are not advocating violence or any other unlawful activity. *Murphy v. Missouri Dept. of Corrections*, 814 F.2d 1252, 1257 (8th Cir.1987) (First Amendment violated by prohibiting mail from Aryan Nation because officials can withhold only literature specifically advocating violence or so racially inflammatory as likely to cause violence). Defendants say that statements in the newsletter asking prisoners to "make some noise" and "harass the hell out of the system" encourage "violent self-help remedies by prisoners," but this is a misrepresentation of the newsletter. Each of those statements is made in the context of asking prisoners' friends and family to take nonviolent action to bring about change, such as writing letters, blogging, electing sympathetic politicians and attending rallies. Defendants may prefer that such activities not take place, but they have no legitimate basis for preventing them.

Next, defendants say that the newsletter contains false statements about the conditions of the Wisconsin Secure Program Facility, former governor Tommy Thompson and the administrative regulations regarding prison disciplinary procedures. Each of these statements is a part of a commentary and is a matter of opinion. For example, defendants take issue with the view of the author of one article that the procedural protections of the prison disciplinary code have been "gutted." Although it is true as defendants point out that many protections remain, it also true as plaintiff points out that the regulations were substantially revised in 2000. These revisions did eliminate a number of limitations on the discretion of prison officials in the context of disciplinary proceedings, including limitations on placement in temporary lock up, Wis. Admin. Code

§ 303.11(3) (allowing administrator to extend prisoner's time in temporary lock up without cause), time limits on providing a hearing, § DOC 303.76(3) and various notice requirements § DOC 303.81(9). In addition, the revisions eliminated a number of defenses, increased the available penalties and gave wardens more discretion to keep prisoners in program segregation and gave them more time to review disciplinary appeals. Order of the Department of Corrections Repealing and Recreating Rules (Nov. 7, 2000). Thus, there is room for debate regarding the nature of changes to the regulations. Censorship of the discussion of these regulations in the newsletter is simply censorship of a view that is critical of the Department of Corrections.

With respect to the discussion of the Wisconsin Secure Program Facility, defendants do not contradict any of the statements regarding the changes to the settlement agreement, which was the focus of the article. However, defendants object to one sentence of the article that characterizes the conditions of the prison as providing "[n]o school, no work, no cafeteria, less canteen, no contact visits, no storage for property, tiny cells, and the close proximity of the revolving door to the dungeons." Although defendants say this statement is inaccurate, it is little different from the description of the prison found in *Jones 'El v. Berge*, 164 F.Supp.2d 1096 (W2001), or the image of the prison likely held by most inmates in Wisconsin. The Department of Corrections has made changes in recent years, but many of these (particularly with respect to programming) were made during or after the modifications to the settlement agreement. Further, defendants' stated belief that the article will discourage prisoners from participating in programming is nonsensical. The article is criticizing a lack of programming, not telling prisoners to refrain from participating.

Finally, defendants argue that many of the articles in the newsletter encourage "distrust" of staff and "hopelessness" among prisoners, but again, defendants do not identify any basis for this belief other than the assertions in the newsletter that aspects of the Wisconsin criminal justice system are unfair and unjust. If I were to adopt defendants' view that such statements were enough to justify suppression, it would suggest that prison officials' censoring power was nearly boundless. It would extend to writings such as judicial opinions, *e.g., Gillis v. Litscher*, 468 F.3d 488 (7th Cir.2006) (comparing conditions at Wisconsin prison to "a soviet gulag"); *Jones 'El*, 164 F.Supp.2d at 1120 (crediting expert testimony that conditions at Wisconsin prison "border on barbarism"); reports by human rights and civil rights organizations condemning prison conditions, *e.g.*, American Civil Liberties Union, *Abandoned and Abused* (2006) (condemning treatment of prisoners during aftermath of Hurricane Katrina); Human Rights Watch, *No Escape* (2001) (condemning prison officials' failures to stop prison rape); or even famous writings such as Martin Luther King's "Letter from Birmingham Jail," which challenges the entire system of justice in the South.

In any event, it is difficult to credit the view that the newsletter fosters hopelessness. Although it contains many discussions of perceived unfairness, the recurring theme of the newsletter is one of empowerment, telling prisoners to work with their families and friends to make change.

Despite their insistence that plaintiff has no right to read a publication such as *The New Abolitionist*, defendants fail to cite even one case in which a court upheld censorship of this type of criticism. I conclude that defendants have failed to show that their censorship of the Prisoner Ac-

tion Coalition newsletter is logically connected to a legitimate penological interest. To the extent that defendants censored the newsletter out of a true concern for security or rehabilitation, their decision was an exaggerated response to those concerns. This conclusion is further supported by the fact that multiple Wisconsin prisoners received the newsletter without apparent consequence. Because defendants have not satisfied the first factor under *Turner*, I need not consider whether plaintiff has adequate alternatives for exercising his First Amendment rights and whether prison officials have other ways to advance their legitimate interests without suppressing speech. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2nd Cir.2006) (The first *Turner* "factor" is more properly labeled an "element" because it is not simply a consideration to be weighed but rather an essential requirement.)

This leaves the issue of remedy. Plaintiff seeks a declaration that defendants violated his constitutional rights, an injunction directing defendants to provide him with the newsletter, $10,000 in compensatory damages and $25,000 in punitive damages. The availability of declaratory and injunctive relief is determined by the court; an appropriate award of damages is determined by a jury within legal limits. *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643, 649 (7th Cir.2002).

▮ In this case, there is no need to hold a hearing on the appropriate injunctive relief because plaintiff is clearly entitled to delivery of the newsletter. Under 18 U.S.C. § 3626, injunctions in civil actions brought by prisoners "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." Because it violated plaintiff's First Amendment rights to censor the Prisoner Action Coalition's newsletter, to correct the violation it is necessary to provide plaintiff with a copy.

The question of damages must proceed to trial. Plaintiff should be aware that 42 U.S.C. § 1997e(e) prevents him from obtaining damages for any emotional pain and suffering. Because it seems unlikely that plaintiff suffered any economic harm as a result of not receiving the newsletter, it is not clear how plaintiff calculated his compensatory damages as $10,000. In any event, it will be plaintiff's burden at trial to prove any losses he sustained. *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). To recover punitive damages, plaintiff will have to prove that defendants acted with "evil motive or intent" or with "reckless or callous indifference" to his First Amendment rights. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In light of the limited amount of damages available to plaintiff in this case, the parties are strongly encouraged to settle their remaining disputes without a trial.

### ORDER

IT IS ORDERED that

1. Plaintiff Lorenzo Johnson's motion for summary judgment, dkt. # 19, is GRANTED. The motion for summary judgment filed by defendants Rick Raemisch, Dane Westfield and Mike Thurmer, dkt. # 8, is DENIED.

2. It is DECLARED the defendants violated plaintiff's First Amendment rights by refusing to deliver to him the March 22, 2007 edition of *The New Abolitionist*. Defendants are directed to deliver a copy of the newsletter to him immediately.

3. This case will proceed to trial on the question of damages.